Smith v. Smith.

---

ALICE B. SMITH

*v.*

CHARLES J. M. SMITH.

1. A decree in favor of a wife against her husband, under the twentieth section of the Divorce act, founded upon an actual abandonment on a particular day—*Held*, in a subsequent suit for absolute divorce on the ground of desertion, to be conclusive evidence of a desertion on that day.

2. It is no bar to the wife's suit for divorce by reason of desertion by the husband for the statutory period, that she in fact, during that period, did not desire her husband to return and felt unwilling to live with him, provided such state of feeling on her part was the result of her husband's misconduct, involving cruel treatment of her.

Heard on bill, answer and proofs.

*Mr. William Pintard,* for the complainant.

*Mr. Edmund Wilson,* for the defendant.

PITNEY, V. C.

This is a bill for divorce on the ground of desertion. It was filed on the 29th of April, 1896, and sets forth a desertion on the 2d day of March, 1894. It casually mentions that the defendant has contributed to the support of the complainant since the desertion under a decree of this court made on the 24th of January, 1895.

The answer admits the marriage, admits the payment of the money under the decree of the court mentioned in the bill, and denies that he deserted the complainant on the 2d of March, 1894, and that he has willfully, continuedly and obstinately deserted her since that time, and charges that previous to the 2d of March, 1894, the complainant had frequently threatened him with violence and had inflicted bodily injury upon him, and declared that she would continue such conduct unless he conveyed to her certain properties mentioned in the answer and referred to hereafter; and that on the 2d of March, 1894, she assaulted him because he refused to give her a certain certificate of bank stock, and attempted by violence to take it from his possession, and shut him in a room and confined him there for over three hours and attempted by duress to gain physical possession of the certificate.

Further, by way of cross-bill, the answer sets up that he, the defendant, has not lived with nor shared the companionship or society of the complainant since the 2d of March, 1894, and then charges her with adultery on divers dates and times in the years 1890, 1891, 1892 and 1893 with one Charles Smith, and prays that he may be divorced from her on that ground.

At the hearing, the complainant, in order to sustain the issue on her part, introduced in evidence the bill, answer and decree of this court in a suit brought by her against her husband for

maintenance, under the twentieth section of the Divorce act. The bill in that cause was filed on the 16th of March, 1894, and set up that she had been married to the defendant in 1888; that she lived with him in various houses, at various places in New Jersey, until the 2d of March, 1894, when he abandoned her. She charged that, during all that time, he failed to provide for her, so that she was obliged to work to support herself, and that he treated her in a brutal manner—struck and bit and kicked her on various occasions—and that on the 2d of March, 1894, he packed up all his personal belongings—clothing and some books and other chattel articles—and moved away from their house, declaring that he would not live with her any longer; that he intended to return to the house, and wished her to leave, so that, by the 1st of April, he could take possession of it, but that she declined to leave, and was, at the time of the filing of the bill, still in possession.

That bill set out other facts with regard to the pecuniary situation and ability of the defendant, which will be referred to further on.

The defendant filed his answer to that bill on the 14th of May, 1894, in which he admitted the marriage and his having lived with his wife at various places in this state, as set out in the bill; denied any rough or cruel treatment, but says that the only violence he ever used towards her was when he found it necessary to protect himself from her violence in attempting to forcibly take from his possession the certificate of bank stock, and charged her with having, on one occasion, struck him with violence, such as to leave permanent marks upon him. He alleged that on the 2d of March, 1894, he packed up his personal belongings and left the house where the complainant now lives, saying that he was going away to leave her and not live with her any longer, as charged in the said complainant's bill of complaint, but he denied that, upon that occasion, he said he would return on the 1st of April and bring some other woman with him, and wished his wife to leave the house, so as to get possession. He admits that he caused a notice to be published in the newspapers declaring that he would no longer be respon-

sible for debts contracted by her. He charges extreme cruelty in her treatment of him and frequent infliction of bodily injuries, and reasserts the assault committed on him on the 2d of March, in what appears to have been a scrambling quarrel for the possession of the certificate of bank stock.

It will be observed that this answer sets up no adultery, nor does it allege any willingness on the part of the defendant to resume cohabitation with his wife.

That cause was brought to a hearing and a decree was made on the 24th of January, 1895, in favor of the complainant, that defendant pay her $400 a year, commencing with the 2d of March, 1894, and ordering the defendant to give bond, with security, to insure the payment.

The decree recites

"that the defendant, without justifiable cause, abandoned and separated himself from his wife, the complainant, on the second day of March, eighteen hundred and ninety-four, and has ever since refused, and still refuses, to maintain and provide for her."

On the hearing of this cause I held that the pleadings and decree in that cause were conclusive that the defendant did separate himself from his wife on the 2d of March, 1894, and refused to permit the defendant to contradict that fact; but, subject to further consideration, I permitted the defendant to offer proof, first, of his subsequent *bona fide* offers to resume cohabitation and live with his wife and support her in the ordinary way, and second, to prove the adulteries charged in his answer and cross-bill. The defendant made no attempt to sustain the charge of adultery, but did attempt to prove that he had offered to resume cohabitation with the complainant.

In support of that allegation the defendant swears that on the 3d of March, and several days subsequently, he returned to the house where his wife was living and asked her if she would not have him come back and live with her, and that she declared that she never would live with him again. This asking to come back and live with her was positively denied by the wife, and I find her quite as reliable as a witness as he. The husband

15

further swore that he did remove his belongings from day to day, commencing on the day after the 2d of March, until he had taken them all away from the house where his wife lived except one bedroom suit, which he said belonged to him but which he left for her use.

· The only other proof of any offer on his part to resume cohabitation with his wife was in the shape of a letter which he wrote to her some time in September, 1894, and shortly prior to the actual hearing of the suit then pending between them before Advisory Master Williams. They have lived near each other ever since and have never spoken to each other.

In order to understand the force and effect of the letter in question, it is necessary to state other facts that are proven or admitted either by counsel in open court or by the pleadings in the two causes.

The defendant is, apparently, the only child of a wealthy gentleman of Monmouth county, who lived in Middletown township, not far from Red Bank, and was at his death, which occurred some time after the marriage of the parties, the owner of two farms and considerable personal property. By his will he devised the homestead farm, containing about one hundred acres, to his wife for life, and at her decease to go to his son, the defendant. He also devised to his son a second farm, containing about two hundred acres, in the possession of one Quigley as tenant, and spoken of in the evidence as the Quigley farm. This is a farm of considerable value and produced a competent rent. He also left him personal property, including a certificate of bank stock, which at one time was worth nearly three hundred per cent. and attained a value of nearly $5,000.

Some time after the father's death the complainant induced the defendant to make a conveyance to her of the Quigley farm, in which he had a present estate, but in the conveyance the defendant reserved to himself the use of that farm for his own life, so that the settlement gave the wife no present income. The wife swears, and it is hardly disputed, that the husband was thriftless and incapable of carrying on successfully any business, and his appearance on the stand indicates that she was

Smith *v.* Smith.

right in this; and she swears that he furnished her with very slender living and support during the whole of their cohabitation; that after she had acquired the title to the Quigley place, having no comfortable place to live, the defendant's mother having married a second time and desiring to occupy the homestead, the husband, at the request of his wife, built a comfortable cottage on the Quigley place, which they occupied together. Subsequently, the defendant's mother having removed from the homestead, the parties went there to live and were living there at the homestead farm (the present use of which belongs to the defendant's mother) on the 2d of March, 1894, when they separated. The quarrel which was the immediate cause of their separation arose over the possession of the bank stock. The wife heard the husband rummaging in the storeroom where their valuable papers were kept, and not desiring him to get possession of the bank stock and spend the proceeds, she attempted by violence to prevent him, and the result was that he overpowered her, got the certificate of stock, took it away and transferred it to his mother, who swears that she sold it to pay his debts, among others a debt which he had incurred in building the cottage on her farm.

At the same time the defendant conveyed to his mother his title to the homestead farm in consideration of her entering into a covenant to support him comfortably during his lifetime. He also gave her a general power of attorney to transact his business; in fact, submitted himself entirely to her control and guardianship.

At the hearing the defendant appeared to be dressed as an ordinary gentleman, showing no appearance of being engaged in any business or occupation whatever, and on the stand appeared to be of slender intellect.

The difficult question in the cause is as to what effect should be given to the evidence of the wife given in answer to questions in connection with the letter written by defendant to her in September, 1894.

The substance of the letter is as follows : He requested her to come over to the Quigley house, at a certain hour on a day

named, to sign papers transferring to him her title in the Quigley place, and then used the following language: "Will you compromise the lawsuit and come back and live in the cottage?"

The complainant, when asked on the stand what she did in regard to that letter, answered that she did nothing whatever, did not answer it; and asked by me why she did not, answered that she was unwilling to live with her husband again, and that her parents would not permit her to live with him again; that she was afraid of him; that he had pinched her and tickled her and had slapped her.

On a subsequent hearing complainant produced a respectable lady, whose evidence I see no reason whatever to doubt in the least, who visited the parties as a friend at times but on other occasions as a seamstress, and she swears that on one occasion while she was at their house the husband came in and sat down to the tea table in a violent temper, and misbehaved himself by shoving the plates around against each other on the table, and behaved, generally, in an indecent manner, and that his wife complained and said she could not sit at the table, and arose; that thereupon the husband arose and struck her and caught her by the arm and attempted to pull and drag her and put her out of the door, declaring that he would do so, but she caught with her hands to a heavy chair, and by reason of her tenacity to that chair he was unable to get her out of doors. This witness says he then and at other times exhibited considerable temper, and she had seen him at other times punch her with his fingers, not in fun but, as she says, in anger, and she expressed it in such a. way that I have no doubt it was in anger.

Now I think that the mere writing of the letter in question does not improve the position of the defendant. After the occurrences of March 2d, 1894, and the actual abandonment of his wife and withdrawal of support, with the insertion of the insulting notices in the two newspapers, and the permitting her to be ejected from their dwelling, and the putting of himself—properly enough—and his affairs under the complete control of his mother, if he sincerely desired to resume marital relations and live with his wife, and love and cherish her as a husband

should, something more was necessary to be done by him in order to accomplish that result. than the mere writing of the letter in question. He should have gone himself, or should have procured some other proper person to go to her, who could show her reasonable grounds to believe that he would act the part of a husband towards her, and that he would do it by the consent and approbation of his only parent, for it was idle for the wife to go to live with him unless is was to be an harmonious living, and unless that cohabitation had the approval and support of his mother. It was unreasonable to ask her to resume cohabitation with him unless she was assured of a proper support, and she could only be assured of that through the cheerful co-operation and approval of his mother. Therefore, if he really wished, and had any reason to hope, to resume cohabitation with his wife, it was necessary for him to do a great deal more than appears on the face of that letter.

Hence, I conclude that he has not put her in the position of having refused a reasonable request to resume cohabitation.

The difficulty in the case is not that the defendant has made an offer to return, which has been refused, but is found in the frame of mind and the feeling of this lady, which were developed by her examination. The burden is on the defendant, in my judgment, to show that his desertion worked no injury to his wife, because she did not wish him to live with her and she did not wish to live with him, and a person who is willingly injured is not injured.

*Volenti non fit injuria* is the principle. But that maxim, in my judgment, does not apply here if, as a matter of fact, the defendant himself is responsible for the feelings of aversion entertained by the wife. If he, by his conduct, has alienated her affections and given her good cause to dislike him and to have no desire to live with him, he cannot take advantage of those feelings to excuse himself for a continued desertion without any serious and honest effort to terminate it.

The question then is, was the defendant responsible for his wife's dislike of him? The complainant knew the defendant and his peculiarities before she married him, but she could not

anticipate that he would lead her an uncomfortable life, or one that she was not obliged to submit to. She says in her evidence, and the original bill alleges, that up to a few months before that bill was filed they lived fairly comfortably, although he didn't support her in the way that a person in his circumstances ought. He was probably unable to do it. I think, from the fact that he kept a fine horse, that he had some expensive habits. Keeping a fine driving-horse takes some money; and as he was not engaged in any business, he would be very likely to spend money. I have no doubt, from the wife's account of it herself, that she was not supported in a manner that she had a right to expect. But that is a very small matter.

In this case it is undoubtedly proven—I must accept it—that he did lay violent hands on her on several occasions, and did it in anger.

Now the measure of the extent of violence which is held by the courts to amount to "cruelty" has changed considerably within fifty years. We are living in an age when physical violence is almost unpardonable; certainly among people of this character. No man of his station in life has the right to lay his hands in anger on his wife. And he is, besides, a man of some peculiarities of temperament and intellect. And can you be sure of a man who has that temperament, who has indulged it once or twice in the way of laying violent hands on his wife? You can only judge of the future by the past, and where a man of that temperament and of that lack of intellectual control over himself has once given way to violence, you don't know what to expect of him. The wife says that she was afraid of her husband and gives as the reason, and proves, that he had used violence towards her.

Then is to be considered the fact that she was treated with great indignity, shortly after the separation, by the publication by him of the two offensive notices in the newspapers, stating that he would not be responsible for her debts any more. And she, undoubtedly, had reason to believe that these notices were not the act of the husband alone, but that he was prompted by the persons behind him; and on the stand it was not pretended

that he wrote and inserted the notices—it was said that he was responsible for them.

Then we have the answer in this cause, and it throws a reflective light. It deliberately charges her with a long course of adultery before the separation, and I gave the defendant an opportunity to prove it, on the ground that it was not known to him when the previous answer was filed and had come to his knowledge since, but not a scintilla of proof has been offered of that charge.

Now it has been held in many cases and in some states that the mere making of an unfounded charge of adultery against the wife is in and of itself extreme cruelty, and it has always been held in this state as an element of cruelty. And the state of mind on the defendant's part which would induce him, whether of his own accord or at the instigation of others, to make this unfounded charge of adultery at this late date, shows what sort of a person he was to live with and what sort of a home he made for his wife.

For these reasons I think the husband should, upon the proofs submitted, be held responsible for the state of mind exhibited by his wife. She swears that she was afraid of him, and I cannot say that she was not justified in it. She evidently had lost all affection for him, and I think that her affection was destroyed by his misconduct. He had abandoned her under aggravating circumstances and had manifested no real desire to go back and live with her.

I think it must be considered as settled, since the decision of the court of errors and appeals in *Sergent v. Sergent, 9 Stew. Eq. 644*, reversing Vice-Chancellor Van Fleet as reported in *6 Stew. Eq. 204*, that the mere fact that the deserted wife, for sufficient reasons, for which her deserting husband is responsible, does not desire to return to him, is no bar to her action for divorce on the ground of his desertion, if he has committed that offence and there is no collusion between the parties. In that case Vice-Chancellor Van Fleet refused the divorce on the ground that it was plain that the desertion of the husband was acquiesced in by the wife and that she really did not wish him to return. But

he was reversed by the court of errors and appeals, and I gather that the real ground of reversal was that the court differed with him on the point above stated.

I hold, therefore, that the state of mind of the complainant herein, having been caused by the misconduct of the defendant, is no bar to her right to a divorce against him on account of his willful and continued desertion, and will advise a decree accordingly.