This is a petition and counter-claim for divorce on the ground of desertion. The petitioner and defendant were married on August 3d 1919. They lived separate and apart until March, 1920, when they took up housekeeping and thereafter lived together until December 28th, 1920, when the petitioner left the defendant at their place of abode and *Page 683 
never thereafter returned thereto or to her. No children were born of the marriage.
The petitioner alleges that the defendant deserted him in the month of March, 1922, and that ever since said time her desertion of him has been willful, continued and obstinate. The defendant not only denies the desertion alleged by the petitioner, but, by way of counter-claim (erroneously described as "cross-petition" — see chancery rule 261), alleges that the petitioner deserted her on December 28th, 1920, and that ever since said time his desertion of her has been willful, continued and obstinate.
The petition was filed June 24th, 1924. The answer and counter-claim of the defendant alleges, and the proofs disclose, that the defendant, on April 30th, 1921 (Docket 49, p. 716), filed a bill against the petitioner for separate maintenance, under section 26 of the Divorce act; and a final decree was entered, by consent, on motion of the solicitor of the defendant in said cause, on October 16th, 1923, as of July 5th, 1921, adjudging that the defendant therein (the petitioner herein), without any justifiable cause, had abandoned the complainant, and separated himself from her, and refused and neglected to provide for her.
The petitioner, answering the defendant's counter-claim, says that the decree entered against him in the aforesaid proceeding was made without his knowledge, approval or consent. The defendant claims that said decree is conclusive between the parties to the suit of the fact of the desertion of the defendant by petitioner at the time alleged in the bill of complaint, December 28th, 1920. The petitioner controverts such claim, and urges that inasmuch as the decree does not specifically mention the date when his abandonment or desertion of the petitioner occurred, said decree is conclusive between the parties of the fact of the desertion only as of the time the decree was entered — assuming said decree to be binding upon him, and notwithstanding his disavowal of knowledge of the entry thereof, and his repudiation of the authority of his solicitor to consent in his behalf to such entry. *Page 684 
In West New York Improvement Co. v. Town of West New York,88 N.J. Eq. 571, it appeared, as it does in the case subjudice, that the decree in question was entered by the consent of counsel. The court of errors and appeals declared that "to get rid of a decree entered by consent of counsel in excess of his authority, the complaining party must act with reasonable promptness * * *." The syllabus of the aforesaid case — which appears to me to state the gist thereof — is as follows:
"A decree of the chancellor adjudicating the rights of parties is a final adjudication of all matters in issue and determined, and such a decree cannot be opened in a collateral proceeding, not directed to that end, simply because it stands in the way of a different result in another cause. The earlier decree settles the rights of parties as to the issues involved and decided in the proceedings on which it is based, and to avoid it must be opened by a direct assault or by an appeal."
In Willis v. Willis, 99 N.J. Eq. 486, it was held that a maintenance decree in favor of a wife against her husband, entered pursuant to section 26 of the Divorce act, is conclusive between the parties of the fact of desertion by the husband at the time named in the maintenance decree. See, also, decision of court of errors and appeals in Popovics v. Popovics, 98 N.J. Eq. 350.
Inasmuch as the decree in the case sub judice does not make mention of the date of the desertion, the date alleged in the bill, in my judgment, must be regarded as the date of desertion.
The proofs in the case sub judice evidence that the petitioner, since March, 1920, when he separated from the defendant, has resided in the town of West New York. To support the allegation of his petition that the defendant deserted him in the month of March, 1922, he testified that he endeavored to effect a reconciliation with the defendant. It is clearly established that the petitioner deserted the defendant on December 28th, 1920, and that he made no bona fide overtures whatever to effect a reconciliation with his wife, or to resume marital relations with her. The defendant continued to reside at 705 Palisade avenue, West New York, *Page 685 
where she and the petitioner resided together up to the time of his desertion of her, until the month of May, 1921, at which time she says she was obliged to give up her home, and went to live with her sister, Elizabeth Gapco, at No. 127 Twentieth street, West New York, where and with whom she resided until the year 1923, when her sister, the defendant accompanying her, removed to Hamilton avenue, in the township of North Bergen, where they resided together until the year 1925, when her sister removed to New York City, and defendant then went to live at No. 325 Thirty-fifth street, Woodcliff, in the township of North Bergen, where she has since resided. The proofs disclose that the defendant, by reason of employment she engaged in, was occasionally at Atlantic City, New Jersey, and at Schroon Lake, New York.
The gist of the petitioner's testimony is that in his endeavor to induce his wife to return to live with him, he met her several times — the first time on Bergenline avenue and Twenty-second street, West New York — when, he says: "I asked her as much as if we couldn't get together again and have these things over with, because it was really a worry on her part and on my part also; we had the trouble and we had the expense." He says he met her several times in the office of the poormaster of West New York, when he visited there to make payments which he was required to make to her under the decree aforesaid. As to one of the occasions when he met her in the poormaster's office, he says: "Well, I asked her the same question again, if we couldn't make up, together, and if we couldn't make up a home again, and have this trouble over with." "She said she was satisfied the way she was. That is the only answer I ever got out of her." Petitioner indicated by his testimony that he could never locate exactly where the defendant lived, or where she was working. It is manifest, from the testimony, that if he made a sincere effort to ascertain the whereabouts of the defendant, he could have readily located her. He says he wrote a letter to her on July 5th, 1922, when she was employed at Schroon Lake, New York, but received no reply thereto. He produced what he claimed to be a copy of the letter he says he forwarded *Page 686 
to her; the defendant, when shown the alleged copy of the letter referred to, said she never received any such letter. He says he requested Michael J. Dilworth, poormaster of West New York, to intercede with his wife, with a view of having her become reconciled with him. He also says he met the defendant on September 13th, 1923, at the home of her sister on Hamilton avenue, North Bergen, when "I asked her again, I said would she be willing to make up a home and drop all these proceedings, because it was costing a lot of money between both of us, that we might just as well get together again, and have this thing over with," and she replied that "she was perfectly satisfied the way she was, and she didn't want to bother about anything else." It developed from his cross-examination that he had only seen his wife four times in all. He says he met her twice at the poormaster's office and twice outside the poormaster's office — once at Twenty-second street and Bergenline avenue (July 10th, 1921) and again at her sister's home (September 13th, 1923). He testified that he had not seen the defendant from March, 1922, when he saw her at the poormaster's office, until September, 1923, when he saw her at her sister's home. He was asked whether he talked to the defendant on the day of the hearing (November 8th, 1926) of the case sub judice; and replied: "No, sir; I did not." And when asked: "Are you friendly to your wife now?" he replied: "No, sir."
The petitioner was very dilatory in making payments which he was required to make to the defendant under the decree aforesaid. I gather, from the testimony, that the requirement of such payment was obnoxious to him.
Mr. Dilworth, overseer of the poor of West New York, in testifying in behalf of the petitioner, says the latter said to him on one of the occasions when he called at his office — "Please talk to my wife and see if we can't come to an agreement and settle this thing" — and then the witness added, "and come back and resume marital relations — I suppose that was the meaning of it; I took it as much." He also says the petitioner said to him: "When my wife comes here will *Page 687 
you speak to her and see if she ain't willing to come back?" The witness says that when the defendant thereafter called at his office to obtain the moneys which were payable to her, he said to her: "Mr. Holst requested me to ask you if you would not return to him again and take up house," and that she replied she was satisfied to carry on as she was going. He testified, also, that on another occasion he said to the defendant: "Mr. Holst would like you to return to him," and she replied she was perfectly satisfied to go on as she was going. Mr. Dilworth says he could not give any fixed date for any of the occasions when the petitioner asked him to talk with his wife about returning to live with him. It appears that this witness was accustomed to visit the place of business of the defendant, to whom he gave orders for supplies to be furnished on requisitions by him as poormaster.
Charles Generelli testified that in September, 1923, he accompanied the petitioner to Hamilton avenue, North Bergen, where the defendant was then living, and overheard a conversation between the petitioner and the defendant, wherein "Mr. Holst offered to give her a home and come back and live together, but she said she was satisfied to live as things were going now." This witness was asked how long he had been outside of the house before he overheard this conversation, and he replied: "Right then and there; I wasn't outside two minutes." It appears, however, from the testimony of the petitioner and the defendant that they were conversing indoors for approximately ten minutes before they went out to the stoop of the house, where they continued their conversation. This witness could not recall any of the conversation had between the parties other than that above mentioned. He was asked whether he could not recall more specifically that which he claims to have overheard by way of conversation between the petitioner and the defendant, and he replied: "It is so far back, I don't even know." He was then asked: "Well, how do you recollect it?" and he replied: "I know it because he told me after that that he had told her them things, and told me he wanted me as a witness."
The defendant, in referring to the occasion when the petitioner *Page 688 
visited her at her sister's home on Hamilton avenue, North Bergen, testified that petitioner operated an open Chandler car, which he parked right in front of her sister's house. She says she did not see the witness Generelli at or near the car, and she denies that her husband made any such request of her as testified to by said witness. She testified that when her husband rang the bell she came downstairs, and he said to her: "Well, what are you going to do — are you going to sue for a divorce?" and she replied: "Why, no, I haven't the least idea of suing for a divorce;" and he then said: "Well, do you intend to live like this? I don't." And then she replied: "Well, I didn't choose for this, you did; I had to take what was left;" and he then said: "Well, if I don't get a divorce in a good way, I will get it the other way;" and she replied: "Well, if you think you can, go ahead." It is significant that the petitioner, though recalled as a witness in his own behalf by way of rebuttal, did not specifically controvert the defendant's testimony in this respect — his counsel being content with asking him whether he ever told his wife he wanted a divorce from her, and the petitioner's reply: "No, sir; I never mentioned the word `divorce' to her."
The defendant testified that the only letter she received from the petitioner was one in which he asked her if she would give him a divorce, that it was no way for him and she to be living, and he did not intend living like that, and it was best for him and better for her that she give him a divorce. She says she did not reply to said letter because she did not want a divorce. She controverted, by her testimony, the statement of Mr. Dilworth, the poormaster, that he had informed her that her husband wanted her to come back and live with him. She says Mr. Dilworth never asked her. She testified she asked Mr. Dilworth a number of times to speak to her husband to come and live with her again, and she knew Mr. Dilworth spoke to her husband in regard thereto, because she waited until her husband went out of the poormaster's office, and then asked Mr. Dilworth what her husband had said, and Mr. Dilworth replied: "He don't know what he wants *Page 689 
to do; you know how he is, he wants to stay the way he is." The defendant says she spoke to Mr. Dilworth about two dozen times, at least, about wanting her husband to come back to her. She also says that she telephoned to her husband a number of times, and also went twice to the store where he was employed. This, she says, was in the spring of 1921. Neither petitioner or Mr. Dilworth controverted this testimony. The proofs throughout manifest to me that the defendant was not only desirous of having the petitioner return to live with her, but that she was anxious therefor. She denies that she stated to her husband, at any time, that she was satisfied with the way she was getting along. She says that a doctor, who was treating her, went to her husband's place and asked him to return to her, and to call and see her. This the petitioner did not deny. She testified that in June, 1924, while she was employed in a hotel in Atlantic City, a Mr. Heyser called to see her and said: "What are you going to do; are you going to give Will a divorce?" and she replied: "No, I haven't even a thought of suing for a divorce," and he then said: "Why, he is anxious to get free, and wants to get free; why don't you give him a divorce?" and she replied: "I don't want to." She testified that Mr. Heyser informed her that the petitioner sent him to her to persuade her to give him a divorce. Her testimony, in this respect, was admitted without objection, and it was not denied by the petitioner. Mr. Heyser was not produced as a witness. His non-production was accounted for by the solicitor of the defendant, as appears from the testimony, by the fact that Mr. Heyser was sick in bed, and also that he was in New York where he could not be subpoenaed to appear at the hearing.
The defendant also testified that the petitioner asked Mr. Dilworth, the overseer of the poor aforesaid, if he could not get the defendant to give the petitioner a divorce, and Mr. Dilworth spoke to her in regard thereto. She says that when Mr. Dilworth talked to her about giving the petitioner a divorce, she said: "No, because, first of all, I didn't have the money, and secondly, I didn't have an idea of suing for *Page 690 
a divorce;" and Mr. Dilworth then replied: "Well, I spoke to Mr. Holst about it, and he said if you would consent to a divorce he would pay all the costs, but, of course, I am going to handle all the money, because it couldn't be done otherwise;" and she replied to Mr. Dilworth, "I am sorry, but I can't do it."
It is significant that Mr. Dilworth was not recalled to controvert the testimony of the defendant as to this conversation with her, nor to make any explanation in regard thereto; nor did the petitioner controvert same, or offer any explanation therefor.
Elizabeth Gapco, a sister of the defendant, testified that the petitioner's place of business was but a short distance from the residence of the witness, 783 Bergenline avenue, with whom the defendant resided. It appears to me that if the petitioner was sincerely desirous of having his wife reunited with him he might reasonably be expected to have made personal appeal to her, particularly inasmuch as he deserted her. If he was sincere he should also have indicated to his wife that he had in contemplation the re-establishment of a home for himself and her, yet he made no reference whatever thereto. I am convinced that the sole purpose of his meagre attempt at effecting a reconciliation with his wife — if given the benefit of his alleged attempts so to do — was to found cause for a suit for divorce on the ground of her alleged desertion of him.
The petitioner's alleged requests for his wife to return to live with him were not such, in my judgment, as might reasonably be calculated to influence her. If he sincerely desired to resume marital relations and live with his wife, something more was necessary to be done by him to accomplish that result than the efforts which he claims to have put forth. The petitioner contributed nothing to his wife's support after his desertion of her, except under the compulsory order of the court, and his payments thereunder were not only irregular, but so much in arrears as to make it necessary for the wife to apply to this court to have him show cause why he should not be adjudged in contempt of the court's order requiring payment to her. *Page 691 
As was said in Popovics v. Popovics, supra (at p. 352): "In estimating the sincerity of such an appeal, the court necessarily proceeds upon the theory quo animo, and in reaching any satisfactory conclusion as to his motives, the old adage that `conduct speaks louder than words' must needs play an important part * * *."
In Baxter v. Baxter, 101 N.J. Eq. 236, the court of errors and appeals, quoting from Hall v. Hall, 60 N.J. Eq. 469,
said: "That a desertion, in order to be obstinate, must be persisted in against the willingness of the injured party to have it concluded, is declared by all our cases; and, ordinarily, when a husband has, by his conduct toward his wife, contributed in any way to her original desertion, the law requires that he should evidence that willingness by making such advances or concessions to his wife as might be reasonably expected to induce her to return to him." The court refers also to Davenport v.Davenport, 97 N.J. Eq. 14, wherein Vice-Chancellor Leaming said: "A wife's desertion, though willful, cannot be adjudged obstinate, unless it has resisted such efforts or concessions on the part of the husband as he ought to have made to bring it to an end under the particular circumstances of the case."
In Cook v. Cook, 97 N.J. Eq. 264 (at p. 269), Vice-Chancellor Bentley says: "`Obstinate,' means against the will of the other party."
In Gordon v. Gordon, 89 N.J. Eq. 535, the court of errors and appeals says: "The burden was upon the petitioner to prove his case, and all uncertainties of fact should be resolved against him."
In Goldberg v. Goldberg, 101 N.J. Eq. 284, the court of errors and appeals held that a husband suing for divorce for desertion must show, even though the original desertion was not justified on the part of the wife, that he sought by proper steps to bring about her return; that the burden of proving such effort is upon the petitioner, and doubt as to his efforts is resolved against him. See, also, Wood v. Wood, 63 N.J. Eq. 688.
The cases of Smith v. Smith, 55 N.J. Eq. 222, and Oertel *Page 692 
v. Oertel, 92 N.J. Eq. 327, are decisive to the effect that at the end of two years from the time of the desertion named in a decree for maintenance, under section 26 of the Divorce act, a cause of action for divorce for desertion matures in favor of the wife, and is operative as a bar to the husband's suit for divorce on the ground of desertion, in the absence of evidence that during that period the husband sought reconciliation. I find as a fact, in the case sub judice, that the petitioner did not at any time after December 28th, 1920, when he deserted the defendant, manifest a sincere desire to resume marital relations with his wife (the defendant), nor make a bona fide effort to effect a reconciliation with her.
I will advise a decree dismissing the petitioner's petition, and granting to the defendant a decree of divorce as prayed for by her in her counter-claim.